1

2

3

4

5

6

7                          **UNITED STATES DISTRICT COURT**

8                               **DISTRICT OF NEVADA**

9                                        * * *

10   KIRK and AMY HENRY,                    )
                                            )        2:08-CV-00635-PMP-GWF
11                                          )
                                            )                **ORDER**
12                         Plaintiffs,      )
                                            )
13   vs.                                    )
                                            )
14   FREDRICK RIZZOLO aka                   )
     RICK RIZZOLO, an individual,          )
15   LISA RIZZOLO, an individual,           )
     THE RICK AND LISA RIZZOLO             )
16   FAMILY TRUST,                          )
                                            )
17                                          )
                           Defendants.      )
18   _____ )

19          Presently before the Court is Defendants Lisa Rizzolo, the Lisa Rizzolo Separate

20   Property Trust, and the LMR Trust's ("Lisa Rizzolo") Motion for Summary Judgment (Doc.

21   #473), filed on September 30, 2010.  Defendants Rick Rizzolo, the Rick and Lisa Rizzolo

22   Family Trust, the Rick J. Rizzolo Separate Property Trust, and the RLR Trust ("Rick

23   Rizzolo"), filed a Joinder (Doc. #476) to this motion on October 1, 2010.  Plaintiffs Kirk

24   and Amy Henry ("the Henrys") filed an Opposition (Doc. #489) on October 25, 2010.

25   Defendant Lisa Rizzolo filed a Reply (Doc. #501) on November 15, 2010.  Defendant Rick

26   Rizzolo filed a Joinder to the Reply (Doc. #502) on November 16, 2010.

## I. BACKGROUND

Defendant Rick Rizzolo owned and operated a strip club, the Crazy Horse Too, through a closely held corporation, The Power Company, Inc.  (Pls.' Opp'n to Mot. Summ. J. [Doc. #489] ("Opp'n"), Ex. 3 at 98.)  As early as the 1980s, both Rick Rizzolo and his wife, Defendant Lisa Rizzolo, were aware that Rick Rizzolo's reputed ties to organized crime had become a subject of interest to the Federal Bureau of Investigation ("FBI"). (Opp'n, Ex. 3 at 88-90, Ex. 4 at 79.)

In May 2001, the Rizzolos consulted an attorney, John Dawson ("Dawson"), for estate planning and asset protection advice.  (Opp'n, Exs. 1, 2.)  Along with other advice, Dawson recommended to Rick Rizzolo that he establish an offshore trust in the Cook Islands, and that this trust hold an Oppenheimer account.  (Opp'n, Ex. 2.)  According to Dawson's letter to Rick Rizzolo, the "advantage of this is, that in the event a U.S. Judge froze any of your assets, the funds in the Oppenheimer Account would be totally protected and would not be subject to being frozen."  (Id.)  Based on Dawson's advice, the Rizzolos formed several trusts and business entities.  (Opp'n, Exs. 1, 2.)

In September 2001, Plaintiff Kirk Henry was injured at the Crazy Horse Too and rendered a quadriplegic.  (Opp'n, Ex. 7; Def.'s Reply [Doc. #501], Ex. I.)  Following Kirk Henry's injury, the Henrys sued Rick Rizzolo and The Power Company in Nevada state court in October 2001.  (Opp'n, Ex. 7.)

In early 2003, the Las Vegas Metropolitan Police Department conducted a search at the Crazy Horse Too.  (Opp'n, Ex. 3 at 93.)  A few weeks later, the FBI and the Internal Revenue Service ("IRS") conducted a raid on the club and removed records, cash registers, and credit card machines.  (Id. at 93-94.)

On May 24, 2005, Defendants Lisa and Rick Rizzolo filed a Joint Petition for Summary Decree of Divorce.  (Opp'n, Ex. 5.)  The Joint Petition divided Rick and Lisa Rizzolo's community property, giving Rick Rizzolo one hundred percent ownership in The

1  Power Company, a Corvette, the interest in a Philadelphia club, and the personal property in

2  his possession, such as clothing and jewelry.  (Id.)  Lisa Rizzolo was to receive a house in

3  Newport Beach, a house in Las Vegas, a condominium in Chicago, Oppenheimer accounts

4  totaling $7.2 million as of that date, three vehicles, and the personal property in her

5  possession, such as clothing and jewelry.  (Id.)

6         As to the value of The Power Company, doing business as the Crazy Horse Too,

7  the Joint Petition, states:

> The Petitioners agree that the value of the community business is
> speculative.  The parties also understand that there may be potential
> debts assessed against the community business in the future,
> specifically but not limited to a civil suit Henry v Powerhouse
> Company Case No. A440740, potential criminal fines, tax impositions
> both current and in the future and any and all current and future debts
> which may be incurred.  The Parties have agreed that Petitioner,
> Fredrick Rizzolo will be responsible for any and all debts and
> impositions of fines and or liens against the community business and
> against himself personally, and hold Lisa Rizzolo completely harmless
> from all such debts.

15  (Id.)  In addition to this property division, Rick Rizzolo was to pay Lisa Rizzolo spousal

16  support in the amount of $83,333 per month for five years.  (Id.)  The Rizzolo's divorce

17  decree was entered in early June 2005, and it incorporated the Joint Petition's terms.

18  (Opp'n, Ex. 6.)

19         After the Rizzolos divorced, the Henrys entered into a settlement with Rick

20  Rizzolo and The Power Company and released their claims in the state court personal injury

21  action in July 2006.  (Def.'s Mot. Summ. J., Ex. 1; Opp'n, Ex. 7.)  The release of claims in

22  the state court personal injury action was done in conjunction with plea agreements entered

23  in June 2006 in criminal cases brought in federal court against Rick Rizzolo, The Power

24  Company, and various other individuals, alleging racketeering activity and tax fraud.

25  (United States v. The Power Company, Inc., 2:06-CR-00186-PMP-PAL.)  Pursuant to the

26  plea agreements and the release of claims in the state civil action, The Power Company and

Rick Rizzolo were to pay the Henrys a total of $10 million, with the first million to be paid at the time of the entry of plea.  (Doc. #7 & #8 in 2:06-CR-00186-PMP-PAL; Def.'s Mot. Summ. J., Ex. 1.)  The remaining $9 million would be due upon the sale of the Crazy Horse Too.  (Doc. #7 & #8 in 2:06-CR-00186-PMP-PAL; Def.'s Mot. Summ. J., Ex. 1.)  The release of claims in the state court action made clear that "[a]lthough it is anticipated that the NINE-MILLION DOLLARS ($9,000,000.00) will be paid from the proceeds of the sale, the obligation to make said payment upon the closing is not contingent upon the realization of net proceeds from the sale sufficient to make the NINE-MILLION DOLLARS ($9,000,000.00) payment."  (Opp'n, Ex. 7.)  At the time the Henrys entered into the settlement agreement, they were aware of the divorce decree in the Rizzolos' divorce proceeding and that the divorce decree incorporated the Joint Petition's division of the Rizzolos' community property.  (Def.'s Mot. Summ. J., Ex. 1.)

Pursuant to the plea agreement, Rick Rizzolo had one year to divest himself of any interest in the Crazy Horse Too and all other similar businesses.  (Doc. #8 in 2:CR-00186-PMP-PAL.)  Rick Rizzolo did not sell the Crazy Horse Too in that one-year time frame.  Instead, in August 2007, the United States moved for the Court to substitute the Crazy Horse Too for over $4 million that Rick Rizzolo had agreed to forfeit to the United States in his plea agreement.  (Ex Parte Mot. for Ct. to Authorize the Substitution, the Forfeiture, and the Sale of the Substitute Assets and the Distribution of the Sale Proceeds (Doc. #58 in 2:06-CR-00186-PMP-PAL).)  The Court granted that motion, and the Crazy Horse too was forfeited to the United States.  (Mins. of Proceedings (Doc. #60).)

Pursuant to federal forfeiture law, various parties made claims for their interests in the forfeited property, including the Henrys.  (Pet. & Settlement Agreement, Stip. for Entry of Order of Forfeiture, & Order (Doc. #68).)  The Court resolved all petitions claiming an interest in the property and set the order of priority of these claims in the First Amended Order of Forfeiture in June 2008.  (First Am. Order of Forfeiture (Doc. #222 in

2:CR-00186-PMP-PAL); see also Second Am. Order of Forfeiture (Doc. #242) in 2:06-CR-00186-PMP-PAL.)  In the meantime, the United States was unable to sell the Crazy Horse Too.  The liquor and exotic dance licenses on the property lapsed at the end of June 2008.  The Crazy Horse Too remained unsold until the first priority lienholder foreclosed and the property was sold at auction on July 1, 2011.  (Notice of Trustee's Sale (Doc. #446 in 2:CR-00186-PMP-PAL).)

While the sale of the Crazy Horse Too languished, the Rizzolos engaged in transfers between each other and with third parties.  After their divorce, Lisa Rizzolo loaned Rick Rizzolo $600,000.  (Opp'n, Ex. 3 at 158-59.)  In April 2008, Rick Rizzolo received $1 million for the sale of his interest in the Philadelphia club.  (Opp'n, Ex. 3 at 124-49; Order (Doc. #437) at 6.)  He deposited that money in a Cook Islands account.  (Opp'n, Ex. 3 at 152.)  Very shortly thereafter, he distributed nearly all the funds, including $600,000 to Lisa Rizzolo for repayment of a loan, $200,000 to Rick Rizzolo's father for repayment of taxes paid, $100,000 to the law firm Patti & Sgro for legal services, and approximately $80,000 to Dawson for legal services.  (Id. at 153-65.)  In addition to the initial $1 million, Rick Rizzolo, through Lions Limited Partnership, was entitled to another $2 million from this sale to be paid out over time.  (Opp'n, Ex. 8.)

During discovery in this case, the Magistrate Judge concluded that–

Defendant Rick Rizzolo's discovery responses in December 2008 and April 2009 regarding his interests in testamentary or inter vivos trusts were clearly deceptive.  At the time of these responses, Mr. Rizzolo must have known of the existence of the RLR Trust and that he had transferred $990,000 into the RLR Trust's bank account in April 2008, which shortly thereafter was withdrawn at his request to pay his attorneys fees, to repay loans from Lisa Rizzolo and her trust, to repay a loan from his father, and to cover Mr. Rizzolo's living expenses.

(Order (Doc. #437) at 9.)  The Magistrate Judge further stated that the "trier of fact may conclude that Mr. Rizzolo's false or deceptive answers to interrogatories demonstrate an ongoing intent to conceal his assets or the disposition of those assets."  (Id. at 9 n.3.)

In addition to these transfers, although Rick Rizzolo owed Lisa Rizzolo over $83,000 per month in spousal support, she made no effort to collect on it prior to her deposition in this case in May 2009.  (Opp'n, Ex. 4 at 145-48.)

Defendants now move for summary judgment on Plaintiffs' NUFTA claim,[1] arguing that Plaintiffs are attempting to plead a conspiracy to violate NUFTA, but that no such claim exists under Nevada law, and, in any event, Plaintiffs fail to plead necessary elements of a conspiracy.  Defendants also argue that no genuine issue of material fact remains that their divorce was not fraudulent because Rick Rizzolo received the Crazy Horse Too, which at the time was a substantially greater valued asset than the remainder of the Rizzolo community property which Lisa Rizzolo received.  Defendants further contend that the Henrys entered into the settlement agreement with full knowledge of Defendants' divorce and division of assets, and of the fact that Rick Rizzolo had no assets other than the Crazy Horse Too, and thus the divorce could not be a fraudulent conveyance as to the Henrys.

The Henrys respond that the Court should deny the motion for failure to comply with Local Rule 56-1, because Defendants do not provide a concise statement of material facts indicating what facts are or are not in dispute, and citing to relevant evidence in support.  On the merits, the Henrys argue genuine issues of material fact remain with respect to their NUFTA claim.  Specifically, the Henrys note that Defendants' motion focuses only on the divorce, but the Henrys allege other fraudulent transfers.  The Henrys thus argue that even if partial summary judgment is appropriate on the divorce, the overall claim must survive.  As to the divorce, the Henrys argue that genuine issues of fact remain, such as the actual value of the Crazy Horse Too, which the Rizzolos' own divorce decree

---

[1]  Defendants also move for summary judgment on counts one and two of Plaintiffs' Second Amended Complaint, but the Court previously granted Plaintiffs' motion to voluntarily dismiss these claims.  (Order (Doc. #533).)  The Court therefore will deny this portion of Defendants' motion as moot.

stated was speculative, and, in any event, the value of property is an issue of fact as a

general matter.  The Henrys further argue that the nature of the sham divorce is evidenced

by the Rizzolos' continued close relationship, their use of a network of business entities and

trusts to shield their assets from potential creditors, and the transactions Defendants entered

into with each other through these businesses and trusts.

**II. DISCUSSION**

Summary judgment is appropriate if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the

governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An

issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find

for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th

Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue

of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the

moving party meets its burden, the burden shifts to the non-moving party to produce

evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all

evidence in the light most favorable to the non-moving party.  Id.

Under Nevada law, a transfer is fraudulent if the debtor made the transfer with

"actual intent to hinder, delay or defraud any creditor of the debtor." Nev. Rev. Stat.

§ 112.180(1)(a).  In determining whether the debtor acted with actual intent, the fact finder

may consider whether the transfer was made to an insider; the debtor retained possession or

control of the property after the transfer; the debtor concealed the transfer; the debtor had

been sued or threatened with suit before making the transfer; the debtor transferred

substantially all his assets; the debtor absconded; and the debtor removed or concealed

assets.  Nev. Rev. Stat. § 112.180(2).  Additionally, the fact finder may consider whether

the value of the consideration the debtor received was reasonably equivalent to the value of the asset transferred; the debtor was insolvent or became insolvent shortly after the transfer; the debtor transferred the asset around the time he incurred a substantial debt; and the debtor transferred the business's essential assets to a lienor who transferred the assets to an insider of the debtor.  Id.

As a preliminary matter, the Court will not deny the motion for failure to comply with the Local Rules.  Although Defendant's motion fails to support nearly all of its factual statements with citations to the record, Defendant's failure is not so egregious as to warrant no consideration of her motion.  The consequence of the failure to cite to evidence in support of her motion is the possibility that she will not meet her burden of establishing no genuine issue of fact remains.  In turn, the Court rejects Defendant Lisa Rizzolo's contention that Plaintiffs are alleging a conspiracy to violate NUFTA.  Plaintiffs' third claim is plainly pled as fraudulent transfers, not as a conspiracy.

Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find the division of property in the divorce was done with actual intent to hinder, delay, or defraud the Henrys.  Although Defendants contend no issue of fact remains because the division of marital property was reasonable given the "undisputed" value of the Crazy Horse Too at the time, Defendants present no evidence to that effect in the initial motion or the joinder thereto.  In reply, Defendant Lisa Rizzolo cites to pages 31 to 33 of Kirk Henry's deposition in support.  Nowhere in the cited pages does anyone even reference the value of the Crazy Horse Too, much less that it undisputably was over $30 million.

Moreover, genuine issues of fact remain regarding the Crazy Horse Too's value. The Joint Petition itself noted that the value of the Crazy Horse Too was speculative given the Henrys' claim against The Power Company as well as the possibility of criminal fines. Moreover, despite the purported value of the business, Rick Rizzolo was unable to sell the Crazy Horse Too for anything approaching this purportedly "undisputed" value in the year

1  following his plea agreement.

2        Even if the value of the Crazy Horse Too undisputably was $30 million or more,

3  that would not preclude a reasonable jury from finding that the Rizzolos structured their

4  divorce to defraud, hinder, or delay the Henrys.  At the time of their divorce, the Rizzolos

5  did not know the extent of the civil and criminal liability arising out of the operation of the

6  Crazy Horse Too.  Rick Rizzolo did not settle with the Henrys and the United States until a

7  year later.  Thus, it was not evident in May or June 2005, when the Rizzolos divorced, that

8  $30 million worth of value in the Crazy Horse Too would cover all liabilities.

9        Viewing the facts in the light most favorable to the Henrys, a reasonable jury

10  could conclude that the Rizzolos structured the division of their assets in their divorce to

11  leave Rick Rizzolo with the Crazy Horse Too, which was the subject of both the Henrys'

12  civil suit and the federal criminal investigation, and put nearly all other assets in Lisa

13  Rizzolo's control in an attempt to shield those assets from creditors, including the Henrys.

14  At the time of the divorce, the Rizzolos knew Rick Rizzolo was under FBI and IRS

15  investigation and that the Henrys asserted a substantial personal injury claim against Rick

16  Rizzolo and The Power Company d/b/a the Crazy Horse Too.  Given the parties' post-

17  divorce conduct, a reasonable jury could conclude that Rick Rizzolo retained control of at

18  least some of the assets.  After their divorce, Lisa Rizzolo loaned her ex-husband $600,000

19  despite the fact that he owed her over $83,000 per month in spousal support, for which he

20  has yet to make a single payment.  Lisa Rizzolo made no effort to collect on this obligation

21  until after her failure to do so was pointed out to her in her deposition over four years after

22  the divorce.  The fact that the Henrys were aware of the division of assets in the divorce

23  prior to entering into the settlement agreement does not negate the possibility of a jury

24  finding that the Rizzolos acted with the requisite intent.

25        Further, Lisa Rizzolo's motion was directed solely at the divorce, but the Second

26  Amended Complaint alleges transfers beyond the divorce.  Consequently, even if the Court

were to grant summary judgment in relation to the divorce, the Henrys' NUFTA claim

would survive in relation to these other transfers.  For example, a reasonable jury could

conclude that Rick Rizzolo transferred the $600,000 to Lisa Rizzolo upon the sale of the

Philadelphia club with the actual intent to hinder, delay, or defraud the Henrys.  By the time

of this transfer, Rick Rizzolo and the United States had been unable to sell the Crazy Horse

Too.  Upon receipt of $1 million from the sale of the Philadelphia club, Rick Rizzolo

immediately dispersed those funds from his Cook Islands account, including $600,000 to

Lisa Rizzolo to repay what amounted to a zero interest loan from his ex-wife.  In discovery

in this matter, Rick Rizzolo was deceptive in his discovery responses regarding this

account.  A reasonable jury could conclude Rick Rizzolo was deceptive because he made

the transfer with the intent to conceal his assets and their disposition from creditors,

including the Henrys.  The Court therefore will deny Defendant Lisa Rizzolo's motion for

summary judgment.

**III. CONCLUSION**

IT IS THEREFORE ORDERED that Defendants Lisa Rizzolo, the Lisa Rizzolo

Separate Property Trust, and the LMR Trust's ("Lisa Rizzolo") Motion for Summary

Judgment (Doc. #473) is hereby DENIED.

DATED: July 28, 2011

PHILIP M. PRO
United States District Judge