**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| KIRK and AMY HENRY, | 2:08-CV-00635-PMP-GWF |
| Plaintiffs, | **ORDER** |
| vs. | |
| FREDRICK RIZZOLO aka RICK RIZZOLO, an individual; LISA RIZZOLO, an individual; and THE RICK AND LISA RIZZOLO FAMILY TRUST, | |
| Defendants. | |

Presently before the Court is Plaintiffs Kirk and Amy Henry's Motion for Summary Judgment as to Defendants Rick and Kimtran Rizzolo (Doc. #554), filed on November 7, 2011. Defendant Rick Rizzolo filed an Opposition (Doc. #559) on November 30, 2011. Defendant Kimtran Rizzolo filed an Opposition and Countermotion for Summary Judgment (Doc. #561) on December 6, 2011. Plaintiffs filed a Reply (Doc. #563) on December 19, 2011.

///

///

## I. BACKGROUND

Defendant Rick Rizzolo owned and operated a strip club, the Crazy Horse Too, through a closely held corporation, The Power Company, Inc. (Order (Doc. #536).) In September 2001, Plaintiff Kirk Henry was injured at the Crazy Horse Too and rendered a quadriplegic. (Id.) Following Kirk Henry's injury, Plaintiffs sued Rick Rizzolo and The Power Company in Nevada state court in October 2001. (Id.)

In mid to late 2002, Rick Rizzolo discussed opening a strip club in Philadelphia with Vincent Piazza ("Piazza"). (Pls.' Mot. Summ. J. (Doc. #554) ("MSJ"), Ex. 4 at 121-23.) Piazza, Rick Rizzolo, and a third party formed a limited partnership, TEZ Limited Partnership ("TEZ"), to purchase real estate in Pennsylvania on which the club would be developed. (MSJ, Ex. 6 at 27.) The limited partners in TEZ were the Piazza Family Limited Partnership ("PFLP"), which was Piazza's entity; Lions Limited Partnership ("Lions LP"), which was Rick Rizzolo's entity; and Rosalia Coscia. (Id. at 27, 36.) Rick Rizzolo invested approximately $2 million in the venture. (MSJ, Ex. 4 at 123-24.) Rick Rizzolo was going to act as a consultant for the Philadelphia club, but after Rick Rizzolo encountered criminal legal problems in Las Vegas, he requested Piazza buy him out of the deal. (MSJ, Ex. 5 at 38, 45-46, 49.)

In July 2006, Plaintiffs entered into a settlement with Rick Rizzolo and The Power Company and released their claims in the state court personal injury action. (MSJ, Ex. 1.) The release of claims in the state court personal injury action was done in conjunction with plea agreements entered in June 2006 in criminal cases brought in federal court against Rick Rizzolo, The Power Company, and various other individuals, alleging racketeering activity and tax fraud. (United States v. The Power Company, Inc., 2:06-CR-00186-PMP-PAL.) Pursuant to the plea agreements and the release of claims in the state civil action, The Power Company and Rick Rizzolo were to pay Plaintiffs a total of $10 million, with the first million to be paid at the time of the entry of plea. (Doc. #7 & #8 in

2:06-CR-00186-PMP-PAL; MSJ, Ex. 1.)  The remaining $9 million would be due upon the sale of the Crazy Horse Too.  (Doc. #7 & #8 in 2:06-CR-00186-PMP-PAL; MSJ, Ex. 1.) The release of claims in the state court action made clear that "[a]lthough it is anticipated that the NINE-MILLION DOLLARS ($9,000,000.00) will be paid from the proceeds of the sale, the obligation to make said payment upon the closing is not contingent upon the realization of net proceeds from the sale sufficient to make the NINE-MILLION DOLLARS ($9,000,000.00) payment."  (MSJ, Ex. 1.)

In the meantime, while the sale of the Crazy Horse Too languished, Piazza obtained a third party purchaser for the Philadelphia club, and in October 2007, PFLP and Lions LP entered into an agreement pursuant to which PFLP purchased Lions LP's interest in TEZ.  (MSJ, Ex. 5 at 32-36, Ex. 6 at 61, Ex. 7.)  Under the buyout, PFLP paid Lions LP $1 million in cash at closing, with another $2 million to be paid to Lions LP through deferred periodic payments obtained through stock puts.  (MSJ, Ex. 5 at 32-36, Ex. 6 at 61-62, 65-66, 69-70.)

At the close of escrow on the sale of Lions LP's interest in TEZ in April 2008, PFLP sent a check made out to Lions LP in the amount of $999,000 to Rick Rizzolo's attorney, John Dawson ("Dawson"), which was deposited in Rick Rizzolo's account in the Cook Islands.[1]  (MSJ, Ex. 4 at 149-52, Ex. 6 at 91.)  Very shortly thereafter, nearly all the funds were distributed, including $600,000 to Lisa Rizzolo; $200,000 to Rick Rizzolo's father, Bart Rizzolo; $100,000 to the law firm Patti & Sgro; and approximately $80,000 to Dawson.  (MSJ, Ex. 4 at 153-65.)

Around this same time, Rick Rizzolo assigned Lions LP's rights to the first $789,000 of the remaining $2 million in payments to Bart Rizzolo.  (MSJ, Ex. 6 at 86, Ex. 9.)  On July 8, 2008, one of Rick Rizzolo's attorneys faxed to Dawson a "list of loans made by Bart Rizzolo," and inquired of Dawson whether Lions LP could assign the balance due

---

[1]  A separate $1,000 check was paid to Rick Rizzolo individually.  (MSJ, Ex. 6 at 91.)

3

on the sale of the Philadelphia property to Bart Rizzolo "before somebody else seeks to attach the payments" which were not due to begin until the following February. (MSJ, Ex. 4 at 293-94.) At his deposition, Rick Rizzolo was questioned about who he anticipated would seek to attach the payments:

> Q: Why was your attorney inquiring of yet another one of your attorneys as to whether or not future payments that were expected to be made pursuant to that sale could be transferred to your father?
> A: Because I owed him money.
> Q: Excuse me?
> A: I owed him money.
> Q: Well, but that's not what this document says. It says, Before somebody else seeks to attach the payments.
> . . .
> Q: Do you see that, sir?
> A: Yeah.
> Q: Who were you afraid was going to seek to attach those payments?
> A: What do you mean, afraid?
> Q: Well, who did you anticipate would seek to attach the payments?
> A: Well, at that time, the government, the IRS, everybody.
> Q: The Henrys?
> A: The Henrys, whatever.

(Id. at 294-95.)

Despite being under supervised release in relation to his criminal conviction, Rick Rizzolo did not disclose to his probation officer this assignment of payments. (MSJ, Ex. 19 at 9-13.) Rick Rizzolo also was not forthcoming in discovery in this action. During discovery in this case, the Magistrate Judge concluded that–

> Defendant Rick Rizzolo's discovery responses in December 2008 and April 2009 regarding his interests in testamentary or inter vivos trusts were clearly deceptive. At the time of these responses, Mr. Rizzolo must have known of the existence of the RLR Trust and that he had transferred $990,000 into the RLR Trust's bank account in April 2008, which shortly thereafter was withdrawn at his request to pay his attorneys fees, to repay loans from Lisa Rizzolo and her trust, to repay a loan from his father, and to cover Mr. Rizzolo's living expenses.

(Order (Doc. #437) at 9.) The Magistrate Judge further stated that the "trier of fact may conclude that Mr. Rizzolo's false or deceptive answers to interrogatories demonstrate an ongoing intent to conceal his assets or the disposition of those assets." (Id. at 9 n.3.)

4

The assignment of payments to Bart Rizzolo was incorporated into an amendment to the agreement between PFLP and Lions LP in March 2009.[2] (MSJ, Ex. 10.) Pursuant to this amendment, PFLP paid Bart Rizzolo the periodic payments due for the sale of Lions LP's interest in TEZ starting in April 2009. (MSJ, Ex. 6 at 90.) PFLP paid Bart Rizzolo $325,513.81 from April 2009 through February 2010. (MSJ, Ex. 12.)

On March 19, 2010, Bart Rizzolo passed away. (MSJ, Ex. 15 at 34.) In May 2010, Defendant Kimtran Rizzolo, Bart Rizzolo's widow, contacted PFLP and advised PFLP that Bart Rizzolo had passed away. (MSJ, Ex. 14.) Kimtran Rizzolo directed PFLP to forward all further payments to her as executor of Bart Rizzolo's estate. (Id.) PFLP thereafter sent payments to Kimtran Rizzolo, until the assignment of proceeds to Bart Rizzolo was satisfied. (MSJ, Ex. 6 at 96, 97-100.) PFLP paid Kimtran Rizzolo $527,482.22 from April 2010 through March 2011. (MSJ, Ex. 14.) Once the assignment of the initial $789,000 was satisfied, PFLP began making payments to Lions LP again. (MSJ, Ex. 6 at 100.)

Due to an accounting error, the last four payments of $30,000 each that were made to Kimtran Rizzolo should have been paid to Lions LP. (MSJ, Ex. 5 at 77, Ex. 6 at 147-49.) On March 25, 2011, Piazza Management Company sent Kimtran Rizzolo a letter advising her that the last four checks were sent to her in error and must be returned. (MSJ, Ex. 18.) Kimtran Rizzolo admits she received notice that the last four payments were made in error, but she has not returned the funds as requested by PFLP even though she has adequate financial resources to do so. (MSJ, Ex. 6 at 147-48, Ex. 15 at 106-12.)

The Crazy Horse Too did not sell until the first priority lienholder foreclosed and the property was sold at auction on July 1, 2011. (Notice of Trustee's Sale (Doc. #446 in 2:06CR-00186-PMP-PAL).) On September 1, 2011, Plaintiffs' claim for the remaining $9

---

[2] Rick Rizzolo did not disclose this transaction to his probation officer either. (MSJ, Ex. 19 at 9-13.)

1   million was reduced to Judgment in Nevada state court.  (MSJ, Ex. 2.)

2   Plaintiffs brought a fraudulent transfer action in this Court in May 2008, generally alleging that Defendant Rick Rizzolo has engaged in a series of transactions designed to hinder, delay, or defraud Plaintiffs' ability to collect on the amount due to them under the settlement agreement.  (Compl. (Doc. #1).)  Plaintiffs amended their Complaint in August 2011 to add Kimtran Rizzolo as a defendant with respect to the payments she received from PFLP.  (Third Am. Compl. (Doc. #539).)

Plaintiffs now move for summary judgment, arguing no genuine issue of material fact remains that Rick Rizzolo assigned the first $789,000 of the proceeds from the TEZ transaction to Bart Rizzolo with the intent to hinder, delay, and defraud Plaintiffs.  Plaintiffs contend Rick Rizzolo admitted he executed the assignment with fraudulent intent.  Plaintiffs thus seek recovery of all funds transferred through the assignment to Bart and Kimtran Rizzolo.  Plaintiffs also argue no genuine issue of material fact remains that Rick Rizzolo fraudulently transferred $200,000 to Bart Rizzolo in April 2008.  Plaintiffs contend this Court already has concluded in the related criminal proceedings that Rick Rizzolo's transfer of the $200,000 was part of a scheme to conceal his finances to avoid paying restitution in the criminal action.  Plaintiffs also argue they are entitled to the proceeds of Rick Rizzolo's sale of Lions LP's interest in TEZ.

Defendant Rick Rizzolo responds that he did not incur personal joint and several liability with The Power Company to pay Plaintiffs the balance due under the settlement agreement.  Rick Rizzolo alternatively argues that even if he is personally liable, the transfers were not fraudulent because an issue of fact remains as to whether they were made to pay antecedent debts Rick Rizzolo owed to Bart Rizzolo.  Rick Rizzolo contends a reasonable interpretation of his deposition testimony is that he wanted to satisfy these antecedent debts before Plaintiffs or the IRS could attach the proceeds of the TEZ sale, and that does not amount to fraudulent intent.

1    Kimtran Rizzolo responds by adopting Rick Rizzolo's response, and also by
2 arguing that she received the property at issue as widow of Bart Rizzolo, who executed his
3 will prior to any Judgment entered against Rick Rizzolo. Kimtran Rizzolo thus argues she
4 is entitled to judgment as a matter of law because the property was transferred prior to
5 Plaintiffs becoming judgment creditors. Kimtran Rizzolo also argues Plaintiffs fail to
6 establish a conspiracy.

7 **II. DISCUSSION**

8    Summary judgment is appropriate if the pleadings, the discovery and disclosure
9 materials on file, and any affidavits show that "there is no genuine dispute as to any
10 material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
11 56(a), (c). A fact is "material" if it might affect the outcome of a suit, as determined by the
12 governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An
13 issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find
14 for the non-moving party. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th
15 Cir. 2002). Initially, the moving party bears the burden of proving there is no genuine issue
16 of material fact. Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002). After the
17 moving party meets its burden, the burden shifts to the non-moving party to produce
18 evidence that a genuine issue of material fact remains for trial. Id. The Court views all
19 evidence in the light most favorable to the non-moving party. Id.

20    **A. Rick Rizzolo's Personal Liability, Conspiracy, and Timing of Transfer**

21    The Court already has determined that Rick Rizzolo is personally liable under the
22 settlement agreement. (Order (Doc. #117) at 2.) The Nevada state court also rejected Rick
23 Rizzolo's argument that he is not personally liable and entered Judgment against him.
24 (MSJ, Ex. 2.) Moreover, the Court previously rejected the argument that Plaintiffs have
25 alleged a conspiracy, or that they must be judgment creditors prior to any transfer Plaintiffs
26 allege was fraudulent as to them. (Order (Doc. #536) at 8; Order (Doc. #117) at 2-3.) The

7

Court will not revisit these issues.

### B. Antecedent Debts

Nevada's Uniform Fraudulent Transfer Act ("NUFTA") provides several different means for a creditor to establish a transfer was fraudulent. Under Nevada Revised Statutes § 112.180(1), a transfer is fraudulent as to a creditor regardless of whether the creditor's claim arose before or after the transfer, if the debtor made the transfer:

> (a) With actual intent to hinder, delay or defraud any creditor of the debtor; or
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>   (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>   (2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Nev. Rev. Stat. § 112.180(1). Alternatively, a transfer may be fraudulent as to a creditor whose claim arose before the transfer if the debtor did not receive reasonably equivalent value in exchange for the transfer and the debtor was insolvent or became insolvent as a result of the transfer. Id. § 112.190(1). Reasonably equivalent value may consist of satisfaction of an antecedent debt. Id. § 112.170(1). Finally, a transfer may be fraudulent as to a creditor whose claim arose before the transfer if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time of the transfer, and the insider had reasonable cause to believe the debtor was insolvent. Id. § 112.190(2).

To the extent Defendants are arguing that any repayment of a loan to Bart Rizzolo constitutes "reasonably equivalent value" such that the transfer was not fraudulent under § 112.190(1), the argument is irrelevant. Plaintiffs' fraudulent transfer claim is brought pursuant to § 112.180(1)(a), which requires proof of actual intent to hinder, delay or defraud any creditor of the debtor. (Third Am. Compl. at 7; MSJ at 10.) Where the plaintiff proves actual intent to defraud, the conveyance will be set aside regardless of

whether the debtor received reasonably equivalent value.  See, e.g., Great Neck Plaza, L.P. v. Le Peep Rests., L.L.C., 37 P.3d 485, 492 (Colo. App. 2001) (interpreting the Colorado Uniform Fraudulent Transfer Act and concluding that because the statute "reads in the disjunctive," a plaintiff can prove a fraudulent transfer either by showing actual fraud or by showing constructive fraud); Lyons v. Sec. Pac. Nat'l Bank, 48 Cal. Rptr. 2d 174, 185 (Cal. App. 1995) ("Subdivision (a) is independent of section (b) and does not require proof of anything more than actual intent to defraud.").

However, whether the debtor received reasonably equivalent value is one of the factors to consider in determining whether the debtor acted with actual intent under § 112.180(1)(a).  Nev. Rev. Stat. § 112.180(2)(h).  In determining whether the debtor acted with actual intent under § 112.180(1)(a), the fact finder also may consider whether:

> (a) The transfer or obligation was to an insider;
> (b) The debtor retained possession or control of the property transferred after the transfer;
> (c) The transfer or obligation was disclosed or concealed;
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (e) The transfer was of substantially all the debtor's assets;
> (f) The debtor absconded;
> (g) The debtor removed or concealed assets;
> . . .
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Id. § 112.180(2).

No genuine issue of material fact remains that the transfer was made to an insider, Rick Rizzolo's father,[3] at a time when Rick Rizzolo was involved in or threatened with litigation by Plaintiffs.  At the time of the transfers, the Crazy Horse Too still had not sold, and under the settlement agreement related to the 2001 litigation, Rick Rizzolo was

---

[3] Nev. Rev. Stat. § 112.150(7)(a)(1) (defining "insider" to include "a relative of the debtor").

9

liable for the difference if the sale of the Crazy Horse Too failed to yield sufficient funds to cover the settlement.  By the time of the March 2009 assignment, Plaintiffs had initiated this lawsuit against Rick Rizzolo for other fraudulent transfers.

No genuine issue of material fact remains that Rick Rizzolo concealed the transfers and the related assets he was transferring.  Despite being under supervision by his probation officer and having specific conditions related to the reporting of his financial situation, Rick Rizzolo failed to disclose (1) his receipt of $1 million upon the close of the TEZ sale, (2) the expectation of an additional $2 million in payments from this sale, (3) the April 2008 transfer of $200,000 to Bart Rizzolo, (4) the April 2008 assignment of $789,000 in proceeds to Bart Rizzolo, and (5)  the March 2009 amendment to the TEZ purchase agreement effectuating the transfer of proceeds to Bart Rizzolo.  During discovery in this matter, Rick Rizzolo was deceptive in his discovery responses regarding these assets and transfers.

In addition to the evidence of concealment, Plaintiffs have presented evidence of actual fraudulent intent.  As reflected in the contemporaneous fax transmission and Rick Rizzolo's deposition testimony, the assignment of the first $789,000 in proceeds from the TEZ sale to Bart Rizzolo was, at least in part, an attempt to prevent any of Rick Rizzolo's other creditors from obtaining the money, including Plaintiffs.  Although Rick Rizzolo argues his deposition testimony shows only a desire to pay an antecedent debt, not an intent to defraud, Rick Rizzolo presents (1) no evidence Bart Rizzolo actually made any such loans to Rick Rizzolo, (2) no evidence regarding the amount of any such loans such that a reasonable jury could conclude Rick Rizzolo received reasonably equivalent value for the transfers made to Bart Rizzolo, and (3) no evidence that any such loan was a valid and existing debt.  Rick Rizzolo cannot avoid summary judgment by suggesting an alternative explanation of his own testimony with no evidence raising a genuine issue of fact in support of his position.

Based on Rick Rizzolo's transfer to an insider of substantial funds in the face of his debts owed in conjunction with civil and criminal proceedings, his concealment of those assets and the transfers, and evidence he did so at least in part to avoid Plaintiffs and other creditors from obtaining those funds, no genuine issue of material fact remains that Rick Rizzolo fraudulently transferred proceeds from the TEZ sale to Bart Rizzolo with the actual intent to hinder, delay, or defraud Plaintiffs.  The Court therefore will grant Plaintiffs' Motion for Summary Judgment as to these transfers, and will deny Defendant Kimtran Rizzolo's Countermotion for Summary Judgment.

Pursuant to Federal Rule of Civil Procedure 54(b), the Court hereby directs that the Clerk of Court enter Judgment in favor of Plaintiffs and against Defendants Rick Rizzolo and Kimtran Rizzolo such that Plaintiffs may avoid the transfers to Kimtran Rizzolo in the amount of $1,052,996.03 ($200,000 paid to Bart Rizzolo in April 2008 + $325,513.81 paid to Bart Rizzolo under TEZ assignment + $527,482.22 paid to Kimtran Rizzolo under TEZ assignment).  There is no just reason for delay in entering Judgment as to these fraudulent transfers.  Although Plaintiffs allege various other fraudulent transfers between Rick and Lisa Rizzolo as to which there would be some factual overlap on appeal, those are different transfers between different parties and any further delay prejudices Plaintiffs' right to recovery.

**III. CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment as to Defendants Rick and Kimtran Rizzolo (Doc. #554) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendant Kimtran Rizzolo's Countermotion for Summary Judgment (Doc. #561) is hereby DENIED.

IT IS FURTHER ORDERED that Judgment is hereby entered in favor of Plaintiffs Kirk Henry and Amy Henry and against Defendants Rick Rizzolo and Kimtran Rizzolo.  The transfers to Bart and Kimtran Rizzolo in the total amount of $1,052,996.03

were fraudulent pursuant to Nevada Revised Statutes § 112.180(1)(a) and therefore should be avoided.  Defendants Rick Rizzolo and Kimtran Rizzolo shall make the necessary arrangements to transfer funds in the amount of $1,052,996.03 to Plaintiffs Kirk Henry and Amy Henry within thirty (30) days.  Any such funds transferred to Plaintiffs Kirk Henry and Amy Henry shall be credited toward the Judgment entered against Rick Rizzolo and The Power Company in Kirk and Amy Henry v. The Power Company, Inc., et al., Case No. A440740 in Nevada state court.

DATED:  April 19, 2012

_____
PHILIP M. PRO
United States District Judge