# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

KIRK AND AMY HENRY,

    Plaintiffs,

vs.

FREDRICK RIZZOLO, aka RICK RIZZOLO, *et al.*,

    Defendants.

Case No. 2:08-cv-00635-PMP-GWF

**ORDER**

    This matter is before the Court on Plaintiffs' Motion for Order Permitting Seizure of Defendant Kimtran Rizzolo's Annuity Accounts (#612), filed on July 12, 2012. Defendant Kimtran Rizzolo filed her Opposition to Plaintiff's Motion for Order Permitting Seizure of Annuity Accounts (#620) on July 20, 2012. Garnishee Defendant Transamerica Life Insurance Company filed its Opposition to Plaintiffs' Motion for Order Permitting Seizure of Defendant Kimtran Rizzolo's Annuity Accounts (#616) on July 19, 2012. In addition, Transamerica Life Insurance Company filed a Complaint for Declaratory Judgment, Case No. 2:12-cv-01171-PMP-GWF, in this Court on July 3, 2012 in which it seeks a declaration whether the proceeds deposited into the Transamerica Annuity by Defendant Kimtran Rizzolo are exempt from execution under NRS 687B.290. Plaintiffs filed their Omnibus Reply in Support of Motion for Order Permitting Seizure of Defendant Kimtran Rizzolo's Annuity Accounts (#612) on July 30, 2012. The Court conducted a hearing in this matter on August 21, 2012.

## BACKGROUND

    The Court hereby incorporates the "Background" set forth on pages 2-7 of District Judge Philip Pro's April 19, 2012 Order (#583) granting summary judgment in favor of the Plaintiffs

against Defendants Rick Rizzolo and Kimtran Rizzolo. As set forth in that order, the District Court found that Defendant Rick Rizzolo fraudulently transferred $1,052,996.03 to his father, Bart Rizzolo, and Bart Rizzolo's spouse, Kimtran Rizzolo. The first of these transfers occurred in April 2008 when Rick Rizzolo transferred $200,000 to his father Bart Rizzolo. The $200,000 was part of a $1 million payment that Rick Rizzolo received from the sale of his interest in a limited partnership known as TEZ. The payment was made by the Piazza Family Limited Partnership (PFLP) which purchased Rick Rizzolo's interest. At or about the same time, Rick Rizzolo also assigned to Bart Rizzolo his rights to the first $789,000 of the remaining $2 million that was to be paid from the sale of Rick Rizzolo's interest in TEZ. Pursuant to this assignment, PFLP paid $325,513.81 to Bart Rizzolo in periodic payments from April 2009 through February 2010. Bart Rizzolo died on March 19, 2010. Bart Rizzolo's widow, Defendant Kimtran Rizzolo, directed PFLP to forward all future payments to her as executor of Bart Rizzolo's estate. From April 2010 through March 2011, PFLP paid $527,482.22 to Kimtran Rizzolo. Judge Pro found that Rick Rizzolo made these transfers and assignment to Bart Rizzolo and/or Kimtran Rizzolo with actual intent to hinder, delay and defraud his creditors, in particular the Plaintiffs Kirk and Amy Henry, in violation of Nevada Revised Statute (NRS) §112.180(1)(a). *Order (#583), pgs. 8-12*.

Kimtran Rizzolo owns an annuity contract issued by Metropolitan Life Insurance Company ("Metlife"). Plaintiffs have attached to their *Reply (#624), Exhibit 14,* copies of the following checks that Kimtran Rizzolo wrote from her personal joint account(s) with Bart Rizzolo at Nevada State Bank to fund the purchase of Metlife Annuity No. 4767:

(1) Check No. 7005, dated April 4, 2010, in the amount of $25,000.00;

(2) Check No. 7008, dated April 22, 2010, in the amount of $251,444.00; and

(3) Check No. 7010, dated April 26, 2010, in the amount of $475,836.70.

Kimtran Rizzolo also wrote another check, No. 101, dated April 21, 2010, from an account with Beneficial Financial Group in the amount of $247,716.30 to fund the purchase of Metlife Annuity No. 4767. *Id.* These checks total $999,997.00.

Kimtran Rizzolo's attorney, Herbert Sachs, has represented that funds in the Metlife annuity contract were transferred from an annuity contract with ING USA Annuity and Life Insurance

Company ("ING") that Kimtran Rizzolo owned since 2002 and which predated the fraudulent transfers of Rick Rizzolo's proceeds from the sale of his interest in TEZ. *Kimtran Rizzolo's Opposition (#622), Declaration of Herbert Sachs, paragraph 6, pg. 3.* Plaintiffs have produced an April 16, 2010 check from ING to Kimtran Rizzolo in the amount of $245,514.63, *Reply (#622), Exhibit 15*, which they suggest is the extent of funds withdrawn from the ING annuity to fund the purchase of the Metlife annuity. By the end of April, 2010, however, Bart Rizzolo and Kimtran Rizzolo had received total transfers from the sale of Rick Rizzolo's interest in TEZ in the amount of $617,513.81. This includes the $200,000 payment to Bart Rizzolo in April 2008, plus $417,513.81 that PFLP paid to Bart and Kimtran Rizzolo from April 20, 2009 through April 15, 2010. *Reply (#624), Exhibit 9.* Therefore, at least $382,483.19 ($999,997.00 minus $617,513.81) used to purchase the Metlife annuity in April 2010 came from sources other than fraudulently transferred funds.

Kimtran Rizzolo also purchased annuities with Prudential Life Insurance Company ("Pruco") in or about October and November, 2010. She purchased an annuity on or about October 28, 2010 with a check made payable to Prudential in the amount of $200,000 from Kimtran and Bart Rizzolo's Nevada State Bank joint checking account. *Reply (#624), Exhibit 4.* She purchased a second annuity from Prudential on or about November 16, 2010 in the amount of $38,462.11. *Reply (#624), Exhibit 5.* According to the Interrogatories to Be Answered Under Oath by Prudential Life Insurance Company (#611), filed in this action on July 10, 2012, Annuity Contract No. E1146252 has a surrender value of $184,827.72 as of July 5, 2012. Annuity Contract No. E1149996 has a surrender value of $34,395.13 as of July 5, 2012. *See Docket Entry (#611).*

Between May 25, 2010 and October 19, 2010, Kimtran Rizzolo received an additional $315,482.00 from Vincent Piazza/PFLP in fraudulently transferred funds, which could account for the funds that were used to purchase the Prudential annuity contracts in October and November, 2010. *Reply (#624), Exhibit 9.* Kimtran Rizzolo's attorney Mr. Sachs states in his declaration, however, that the funds used to purchase the Prudential annuity contract(s) came from the proceeds of the sale of real property that Kimtran Rizzolo owned. *Declaration of Herbert Sachs, paragraph 6, pg. 3.* Neither Kimtran Rizzolo or her attorney have provided any documentation for the alleged

3

ownership or sale of the real property, or the distribution of any proceeds from the alleged sale.

Plaintiffs filed their Third Amended Complaint (#539) on August 1, 2011 naming Kimtran Rizzolo as a defendant in this action. The Third Amended Complaint was served on Kimtran Rizzolo on August 12, 2011 and Kimtran Rizzolo filed her answer on September 2, 2011. *Summons Return/Proof of Service (#543); Answer (#547)*. Kimtran Rizzolo obtained two cashier's checks, dated August 17, 2011, made payable to Transamerica Life Insurance Company in the combined amount of $200,000 which were used to purchase Transamerica Annuity Contract No. 121185LB8. The Transamerica annuity contract was issued on August 26, 2011. Plaintiff's *Reply (#624), Exhibits 2 and 3*. According to Transamerica, the annuity has a current surrender value of $191,646.13. *Garnishee Defendant Transamerica's Opposition (#616), pg. 5*.

Plaintiffs have informed the Court that the United States Marshal Service served a writ of garnishment and seizure on Kimtran Rizzolo's bank account at CitiBank which yielded $211,084.89 in partial satisfaction of their judgment against Kimtran Rizzolo. *Motion (#612), pg. 3 n. 1*. Not including additional accrued interest on the judgment and costs of execution, this leaves a balance of $841,911.14 owing on the judgment against Rick Rizzolo and Kimtran Rizzolo. The Court has not been informed that Plaintiffs have collected any other amounts in satisfaction of the judgment.

## DISCUSSION

Two issues are presented by Plaintiffs' motion for permission to seize Defendant Kimtran Rizzolo's annuity accounts. The first issue is whether the annuities are exempt from execution by Plaintiffs regardless of whether they were funded, in whole or in part, with money that Defendant Rick Rizzolo fraudulently transferred to Bart Rizzolo and Kimtran Rizzolo. If the annuity accounts are not exempt from execution, then the second issue is whether Plaintiffs have met their burden to show that the annuities were, in fact, funded with fraudulently transferred funds.

Nevada Revised Statute (NRS) § 687B.290.1 states as follows:

> The benefits, rights, privileges and options which under any annuity contract issued prior to or after January 1, 1972, are due or prospectively due the annuitant shall not be subject to execution nor shall the annuitant be compelled to exercise any such rights, powers or options, nor shall creditors be allowed to interfere with or

> terminate the contract, *except as to amounts paid for or as premium on any such annuity with intent to defraud creditors*, with interest thereon, and of which the creditor has given the insurer written notice at its home office prior to the making of the payment to the annuitant out of which the creditor seeks to recover. Any such notice shall specify the amount claimed or such facts as will enable the insurer to ascertain such amount, and shall set forth such facts as will enable the insurer to ascertain the annuity contract, the annuitant and the payment sought to be avoided on ground of fraud. (emphasis added)

This statute has not been construed by the Nevada Supreme Court or by a lower state or federal court in a reported decision. In *Savage v. Pierson*, 123 Nev. 86, 157 P.3d 697 (2007), which involved the construction of other statutory exemptions, the Nevada Supreme Court stated that words used in a statute should be ascribed their plain meaning, unless that meaning was clearly not intended. The Nevada Supreme Court also cited other rules of statutory construction which are generally applicable here, including: (1) when the same word is used in different statutes that are similar with respect to purpose and content, the word will be used in the same sense, unless the statute's context indicates otherwise; and (2) when possible, the court will avoid rendering any part of a statute inconsequential. The plain language of NRS § 687B.290.1 excepts from the exemption for annuity contracts "amounts paid for or as premium on any such annuity *with intent to defraud creditors*." This language is substantially similar to NRS § 112.180.1(a) which states that a transfer made by a debtor is fraudulent if the debtor made the transfer "with actual intent to hinder, delay or defraud any creditor of the debtor."

This Court has not found any case construing an annuity exemption statute from another jurisdiction that contains the same fraud exception language set forth in NRS § 687B.290.1. In *In re Sosa*, 542 F.3d 1060 (5th Cir. 2008), the Court of Appeals for the Fifth Circuit construed a Texas annuity exemption statute, Tex. Ins. Code Ann. § 1108.053, which states that the exemption "does not apply to 'a premium payment made in fraud of a creditor.'" *Id.* 542 F.3d at 1063. In *Sosa,* a husband and wife transferred $30,000 into an annuity contract one day before they filed for Chapter 7 bankruptcy. The debtors claimed that the annuity was exempt under § 1108.053. The debtors listed only $340 in non-exempt property and approximately $30,000 in unsecured debt. The bankruptcy trustee objected to the claimed exemption based on the fraud exception in § 1108.053. In upholding the trustee's objection, the Fifth Circuit court stated that the phrase "fraud of a

creditor," when read in light of other Texas fraudulent transfer statutes, leaves "little doubt that § 1108.053 must include intentional fraud as well as conduct less than intentional fraud." *Id.* The court noted that other fraudulent conveyance statutes, including the Texas Uniform Fraudulent Transfer Act (TUFTA), state that a transfer is fraudulent if made with the "'actual intent to hinder, delay or defraud any creditor of the debtor.'" The court concluded that the Texas Legislature clearly knows how "to distinguish between provisions defining as fraudulent a transfer made with intent to defraud a creditor and provisions defining a lesser intent to defraud." *Id.* at 1066.

Although *Sosa* is distinguishable from this case in regard to the "level" of fraud required under the statute to invalidate a claimed annuity exemption, it is instructive in regard to what evidence may be relied on to determine whether an annuity was purchased or funded with "the intent to defraud a creditor" or in "fraud of a creditor." The court stated:

> Ultimately, Texas courts will have to determine how much less than actual intent to defraud suffices to deny exemptions for insurance policies and annuities under § 1108.053. For present purposes, we glean some assistance from the non-exclusive list of eleven factors, commonly known, as "badges of fraud", that courts may consider in determining whether a debtor actually intended to defraud creditors under TUFTA. It may appear contradictory to consider facts used to infer actual intent to defraud in order to determine "constructive" fraud. Any contradiction, however, is illusory. Factors relevant to determining actual intent to defraud, a higher culpability standard, should be equally probative where something less than actual intent will suffice. When analyzing facts under TUFTA, this court has noted that "[s]ince direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish fraudulent intent." *Roland v. United States*, 838 F.2d 1400, 140203 (5th Cir. 1988). Not all, or even a majority of the "badges of fraud" must exist to find actual fraud. Indeed, "[w]hen several of these indicia of fraud are found, they can be a proper basis for an inference of fraud." *Roland*, 838 F.2d at 1403.

*In re Sosa*, 542 F.3d at 1066-07.

In concluding that the debtors' conduct was in fraud of their creditors, the court stated:

> They purchased the annuity on the eve of bankruptcy. Assuming the payment came from their non-exempt property, the annuity was in an amount that would have covered all of the debtors' listed debts, and the purchase deprived the creditors of all but $340 in non-exempt assets.

*In re Sosa*, 542 F.3d at 1067.

. . .

This Court finds that NRS § 687B.290.1 plainly contains a requirement of intent to defraud in order for the exception to apply and bar the exemption. A finding of intent to defraud creditors may be inferred from the circumstances, including the "badges of fraud," set forth in NRS § 112.180.2.

Plaintiffs argue that there is a broader equitable or common law exception which provides that an individual should not be permitted to claim statutory exemptions to protect property that was obtained through wrongful conduct. Plaintiffs rely on *Maki v. Chong*, 119 Nev. 390, 75 P.3d 376 (Nev. 2003) in which the plaintiff, a state prisoner, signed a limited power of attorney allowing the defendant to cash his worker's compensation settlement check so that the funds could be used to hire a criminal defense lawyer for the plaintiff. The defendant instead used the money to purchase a home upon which she recorded a declaration of homestead. The plaintiff filed suit and obtained a default judgment against defendant. The plaintiff thereafter attempted to execute upon the residential property, but the district court held that the homestead exemption barred execution.

In reversing, the Nevada Supreme Court stated that the purpose of the homestead exemption is to preserve the family home despite financial distress, insolvency or calamitous circumstances. The Court noted that besides the express statutory exceptions to the exemption, it has allowed the homestead exemption to be disregarded in order to satisfy child support obligations. *Maki*, 119 Nev. at 393, 75 P.3d at 378-9. In holding that the homestead exemption also did not apply under the circumstances before it, the Court stated as follows:

> There is a time-honored principle that states that he who keeps property that he knows belongs to another must restore that property. This idea, manifested in the doctrine of equitable liens, permeates our entire system of justice regarding equity. "[O]ne who has purchased real property with funds of another, under circumstances which ordinarily would entitle such other person to enforce a constructive trust in, or equitable lien against, the property, cannot defeat the right to enforce such trust or lien on the grounds that [the homestead exemption applies]. (citation omitted).

*Maki*, 119 Nev. at 393, 75 P.3d at 379.

The Court further stated:

> "The homestead exemption statute cannot be used as an instrument of fraud and imposition." [citation in footnote omitted] Public policy supports our application of an exception to homestead exemptions for

> victims of fraud or similar tortious conduct. An individual using fraudulently obtained funds to purchase real property should not be protected by the homestead exemption because the exemption's purpose is to provide protection to individuals who file the homestead exemption in good faith.

*Id.* 119 Nev. at 393, 75 P.3d at 379.

The Court concluded:

> Under equitable lien principles, the homestead exemption is inapplicable when the proceeds used to purchase real property can be traced directly to funds obtained through fraud or similar tortious conduct.

*Id.*

There is no reason to believe that the Nevada Supreme Court would have reached a different conclusion if the defendant in *Maki* had deposited the misappropriated funds into an annuity account. Other courts have so held. *See In re Hill*, 163 B.R. 589 (Bankr. N.D.Fla. 1994) and *In re Woodford*, 403 B.R. 177 (Bankr. D.Mass. 2009). The express exception for fraud in NRS § 687B.290.1 also covers such circumstances.

In his order granting summary judgment against Defendants Rick Rizzolo and Kimtran Rizzolo, Judge Pro held that Rick Rizzolo transferred and assigned his presumably lawfully owned assets to Bart Rizzolo and Kimtran Rizzolo with the actual intent to defraud his creditors, including the Henrys. Judge Pro rejected Defendant Rick Rizzolo's argument that the transfers and assignment to Bart Rizzolo were in payment of an antecedent debt. The Court stated that there is (1) no evidence that Bart Rizzolo actually made any such loans to Rick Rizzolo, (2) no evidence regarding the amount of any such loans, and (3) no evidence that any such loan was a valid and existing debt. *Order (#583), pg. 10.* Judge Pro also noted that due to an accounting error, the last four payments of $30,000 each that PFLP made to Kimtran Rizzolo, should have been paid to Lions LP, an entity controlled by Rick Rizzolo. Despite the fact that Kimtran Rizzolo received notice that the last four payments were made in error and was requested to return them to PFLP, she did not do so even though she had adequate financial resources to do so. *Id., pg. 5.* As Plaintiffs' point out in their instant motion, within a few days of being served with the Third Amended Complaint in this action, Kimtran Rizzolo purchased the Transamerica annuity, the timing of which indicates an attempt to place additional funds beyond the reach of the Plaintiffs. These facts

support a finding that Bart Rizzolo and Kimtran Rizzolo knew that Rick Rizzolo's transfer and assignment of his assets to them was fraudulent as to his creditors.

As Plaintiffs acknowledge in their *Reply (#624), pg. 10*, they bear the initial burden of tracing the fraudulently transferred funds by a preponderance of the evidence. *In re Int'l Admin. Serv., Inc.*, 408 F.3d 689, 708 (11th Cir. 2005). The burden of tracing does not require "dollar-for-dollar accounting" however, and the party seeking recovery may meet this burden by identifying the relevant pathways. *Id. See also In re Forbes*, 372 B. 321, 334 (B.A.P. 6th Cir. 2007); *In re Allou Distrib., Inc.*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007). It is undisputed that Rick Rizzolo fraudulently transferred $1,052,996.03 to Bart Rizzolo and Kimtran Rizzolo between April 2008 and March 2011. *See Order (#583)*. Bart and Kimtran Rizzolo deposited those funds in various personal bank accounts from which they were thereafter withdrawn and transferred to other accounts, or otherwise disposed of. *See Reply (#624), pgs. 11-15*. Defendant Kimtran Rizzolo has not provided any specific information as to what became of the fraudulently transferred funds or where they are presently located. During her deposition testimony, Kimtran Rizzolo stated that she spent or otherwise cannot account for the location of the money she or Bart Rizzolo received from Vincent Piazza (PFLP). *See Reply (#624), Exhibit 7*, Deposition of Kimtran Rizzolo, at 94:19-22, 96:6-22, 97:12-16, 98:23-25 -99:1-25, 100:2-17. When asked if she still had the money, she responded "I don't have money now." *Id.* at 111:16-22. Kimtran Rizzolo nonetheless argues that the annuities are exempt from execution because they were purchased with her or Bart Rizzolo's own funds, and not with the fraudulently transferred funds. Kimtran Rizzolo has provided no evidence that would support this assertion. The fact that Kimtran Rizzolo cannot or will not otherwise account for the fraudulently transferred funds, further supports the conclusion that the annuities were purchased with those funds.

Where the assets fraudulently transferred no longer exist or cannot be found due to commingling, a money judgment may be entered in an amount up to the value of the fraudulently transferred assets against the parties who participated in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance. *In re Adelphia Recovery Trust*, 634 F.3d 678, 693 (2d Cir. 2011) (applying New York law). *See also In re Davenport*, 147 B.R. 172,

1  184-5 (Bankr. E.D.Mo. 1992); and *Thompson v. Hanson*, 239 P.3d 537, 540-41 (Wash. 2010)

2  (applying Washington Uniform Fraudulent Transfer Act).

3  The District Court's order and judgment in this case states that:

> Judgment is hereby entered in favor of Plaintiffs Kirk Henry and Amy Henry and against Defendants Rick Rizzolo and Kimtran Rizzolo. The transfers to Bart and Kimtran Rizzolo in the total amount of $1,052,996.03 were fraudulent pursuant to Nevada Revised Statutes § 112.180(1)(a) and therefore should be avoided. Defendant Rick Rizzolo and Kimtran Rizzolo shall make the necessary arrangements to transfer funds in the amount of $1,052,996.03 to Plaintiffs Kirk Henry and Amy Henry within thirty (30) days.

9  *Order (#583), pg. 11-12. See also Judgment in Civil Case (#584).*

10  The order and judgment requiring Defendants Rick Rizzolo and Kimtran Rizzolo to transfer funds in the amount of $1,052,996.03 to Plaintiffs appears to be a judgment entered pursuant to NRS § 112.220.2(a) which states that "the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection 3, or the amount necessary to satisfy the creditor's claim against the first transferee of the asset or the person for whose benefit the transfer was made."

15  The evidence establishes that as of the time that Kimtran Rizzolo issued checks to fund the purchase of the Metlife annuity in April 2010, she and Bart Rizzolo had received a total of $617,513.81 in fraudulently transferred funds. The Prudential annuities that Kimtran Rizzolo purchased later in 2010 could have been fully funded with fraudulently transferred funds she received between May and November of that year. Likewise, the Transamerica annuity that Kim Rizzolo purchased in August 2011 could have been fully funded with fraudulently transferred funds. Kimtran Rizzolo has not accounted for what became of the fraudulently transferred funds, if they were not used to purchase the foregoing annuities. The Court concludes that Kimtran Rizzolo purchased the foregoing annuities in whole or in part with the fraudulently transferred funds with the intent to defraud creditors. Therefore, $617,513.81 of the Metlife annuity, and the full surrender values of the Prudential and Transamerica annuities are not exempt from execution pursuant to the exception set forth in NRS § 687B.290.1 and pursuant to the equitable lien principles set forth in *Maki v. Chong*, 119 Nev. 390, 75 P.3d 376 (Nev. 2003).

28  . . .

Garnishee Defendant Transamerica Insurance Company asserts that it is entitled to a declaratory judgment that it has fulfilled all contractual obligations under the annuity contract, by attempting to protect the exempt status of the annuity, and that it has not engaged in any unlawful conduct and is not liable to Plaintiffs or other persons arising out of the issuance of the subject annuity.  This order holds that the annuities, including the Transamerica annuity, are not exempt from execution based on the conclusion that Kimtran Rizzolo purchased or funded said annuities with the intent to defraud creditors.  Nothing in this order precludes Transamerica from pursuing its action for declaratory judgment that it has complied with all contractual or legal obligations owed to Kimtran Rizzolo or to other persons with respect to the annuity.  Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Order Permitting Seizure of Defendant Kimtran Rizzolo's Annuity Accounts (#612) is **granted** as follows:

Plaintiffs may execute on and recover the cash surrender amount of the annuity issued to Kimtran Rizzolo by Metropolitan Life Insurance Company ("Metlife"), Policy or Annuity contract No. 4767 up to $617,513.81, and may execute on and recover the cash surrender values of Prudential Life Insurance Company, Policy or Annuity Contract Nos. E1146252 and E1149996, and Transamerica Life Insurance Company, Policy or Annuity Contract No. 121185LB8, in satisfaction of the unpaid balance of Plaintiffs' judgment against Defendants Rick Rizzolo and Kimtran Rizzolo.

DATED this 17th day of September, 2012.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge